TWELVE BARRELS OF DISTILLED SPIRITS (UNITED STATES v.). See Case No. 16,551.

TWELVE BARRELS OF PARRAFINE OIL (UNITED STATES v.). See Case No. 16,-552.

TWELVE CASKS OF CUDBEAR (UNITED STATES v.). See Case No. 16,553.

# Case No. 14,279.

## TWELVE HUNDRED AND NINE QUARTER CASKS, ETC., OF WINE.

[2 Ben. 249; [1] 7 Int. Rev. Rec. 114.]

District Court, S. D. New York. March, 1868.

FORFEITURE — CUSTOMS — UNDERVALUATION — BURDEN OF PROOF — EVIDENCE — APPRAISEMENT.

1. Under the act of March 3, 1863 (12 Stat. 737), the invoice of goods imported, which are procured otherwise than by purchase, must state their actual market value at the time and place, when and where, they are procured or manufactured.

2. Actual market value is the price at which the owner or the manufacturer of goods holds them for sale, in the ordinary course of trade.

3. Where, in an action to forfeit, for undervaluation, certain importations of sherry wine, from Cadiz, which had been invoiced at $16 a quarter cask of 40 gallons, it appeared that agents in New York received, and sent to the manufacturers at Cadiz, orders for the wines, and delivered them on the wharf in New York, free of duty, at $1.10 a gallon, effecting insurance on them in New York at the higher value. Held, that if the jury were satisfied that this course of business was adopted for the purpose of concealing the real prices of the wines at Cadiz, they would be authorized to find that the sales upon such orders were sales at Cadiz prices, and that such sales might be considered in determining what was the actual market value at Cadiz, and the jury might consider the rate of insurance in determining that question; but if they found that this course of business was not adopted for that purpose, then such sales were not to be considered, because they would then be sales at New York prices, and, in the latter case, the rate of insurance was immaterial.

[Followed in U. S. v. Doherty, 27 Fed. 737.]

4. If the jury found that the invoice value was below the market value at Cadiz, they must then consider whether that undervaluation was either made "with intent to defraud the revenue," as is said in the act of May 28, 1830 (4 Stat. 409), or made "knowingly," as is said in the act of March 3, 1863 (12 Stat. 737). There is no real difference in meaning between these two expressions.

5. Evidence given to show the value of certain wine, previously sent to this country by the same manufacturers, and not under seizure in this case, was only to be considered in determining the question of intent.

6. Evidence as to the cost of manufacturing a part of the wines, called "Burgundy Port," might be considered by the jury in determining its market value in Cadiz, no evidence of sales in Cadiz of wines of a similar quality having been given; but that similar evidence as to the cost of manufacture of the sherries, was not to be considered on the question of the market value of the sherries.

7. The jury must be satisfied, before they could forfeit the wines, that there was a guilty knowledge, on the part of the manufacturers, that the wines were undervalued; and that "guilty knowledge" means no more than "knowledge."

8. The record of the appraisement and reappraisement of these wines at the custom house in New York, previous to their seizure, was to be taken into consideration on the question of the market value of the wines at Cadiz, but was not the highest evidence on that question.

9. Where letters purporting to contain propositions for the purchase of wines, were received by

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

the manufacturers abroad, and in reply they named their prices for wines for export for cash: *Held*, that if the manufacturers believed that the letters contained regular mercantile propositions, and answered the letters and gave the prices on that supposition, the jury might infer that they would have sold the same wines to any body at the same prices, and that there was a market value thus made and fixed by them; that it was a question for the jury whether the manufacturers believed that the letters contained real proposals or not: and that, if they did so believe, it made no difference whether the proposals in the letters were in fact real or not.

10. The appraisement and reappraisement of goods imported is not conclusive as to their market value, upon either the government or the claimants.

11. The policy of the law allows the seizure, under certain circumstances, of the books and papers of parties suspected of being concerned in frauds upon the revenue, and also sanctions the employment of informers, and gives them a share of the proceeds of property seized, and that policy should not be inveighed against, to influence the minds of the jury.

12. Where probable cause is shown for the forfeiture of imported goods, the burden of proof is upon the claimants to show their innocence.

This was an action to forfeit the wines above named for undervaluation. The wines were imported into New York from Cadiz, in Spain, where they were manufactured by the firm of Lacave & Echecopar, and were called "Crown Sherry," except a small portion of Burgundy port in one invoice. There were several invoices of the wines, by different vessels, and the value stated in the several invoices was $16 a quarter cask (except two casks marked P. & A., invoiced at $30 and $22), being the same value which had been stated in a series of previous invoices. The invoices were all sworn to by one of the firm of Lacave & Echecopar. As they were presented, they were passed through the custom house, but finally, in consequence of information brought to the authorities, the appraisers advanced the price of one invoice $4 a quarter cask, for the purpose of securing a reappraisement. On the reappraisement, the wine was again valued at the invoice value. Notwithstanding this, the government seized the wines, and the information in this case was filed to forfeit them. The government claimed, and gave evidence tending to sustain its claims, that the wines were sold by Lacave & Echecopar at a higher rate than the invoice value, that the system of selling them which was adopted, was a plan to cover up the real value of the wine; that they were insured at much higher rates in New York; and that certain previous transactions with Simon De Visser, Lenau & Co., and one Barnard of Boston, showed higher prices paid for similar wines. They furnished evidence, also, of experts, who gave a higher value to the wine. The claimants gave evidence to show, that their agents in New York, George Miln, and Galway & Casado, made all the sales of the wine in New York, and guaranteed the sales; and they claimed that those sales,

which were made at $1.10 a gallon, deliverable in New York, duty paid, were not evidence of the market value of the wines in Cadiz. They claimed, also, that the reappraisement was conclusive upon the question of value; that the claimants and another firm, that of Bensusan & Co., had offered to sell this wine at the same rate, in Cadiz, on orders sent them by letters from one Samuel D. Jones, which, as it appeared, were actually written and sent by Farwell, an officer of the customs, and a witness in the case for the government; that the wines which were claimed to have been sold at higher values were wines of a different quality from this Crown sherry; and that this was a wine manufactured exclusively by Lacave & Echecopar, and sent by them entirely to the United States. They gave, also, evidence of the cost of manufacture of a small quantity of the wine called "Burgundy Port," as to which no sales were proved.

The case occupied twenty-two days in the trial before the jury.

At the close of the evidence, the counsel for the government requested the court to charge the jury as follows:

1st. That, upon the evidence given by the claimants, the probable cause of condemnation had not been relieved, and the jury must find a verdict for the United States.

2d. That the sales upon orders, at $1.10, deliverable upon the wharf in New York, were sales at Cadiz prices.

3d. That the sales upon orders, at $1.10, deliverable on the wharf in New York, are evidence from which the jury might find the actual market price in Cadiz, by deducting therefrom freight, insurance, duties, and other custom-house charges, and the expense of bringing the wine to the place of delivery.

4th. That if the jury should find, upon all the evidence, that the course of business adopted by the claimants, of selling their wines at the price of $1.10, deliverable on the wharf in New York, was a mode of business adopted for the purpose of concealing the real prices of the wines at Cadiz, the jury must then find that sales upon such orders were sales at Cadiz prices, to be ascertained by deducting from said price of $1.10 the expenses of freight, insurance, duties, and other charges upon the same, from the time of shipping them at Cadiz to their delivery in New York.

5th. That the sales of wine at $1.10, deliverable on the wharf in New York, were, upon the evidence, not sales by George Miln, as a commission merchant, nor by Lacave & Echecopar, as New York importers or merchants, but were direct sales by them as foreign manufacturers.

6th. That if the wines under seizure were entered by means of invoices not truly expressing the actual market value of the wines at the time when, and in the country where, they were manufactured, with the

knowledge on the part of the consignor or of the consignee that the invoices did not contain such actual market value, the goods were forfeited, and the jury must find for the United States.

7th. That if the jury should find, upon all the evidence, that the invoices did not contain such actual market value as aforesaid, and were made up by Lacave & Echecopar with intent to evade the payment of any part of the duties by law chargeable thereon, the goods were forfeited, and the jury must find for the United States.

8th. That the market value to which the manufacturer of wine is required to conform the valuation of his invoice, is of wine of the same grade and quality, as a general article of production and commerce in Spain, and that a manufacturer cannot escape the obligation to conform his invoice to that general market value, by the pretence or the fact that he does not offer his particular brand of wine in the market of Spain, but sends it in exportation; but, in such case, the valuation in the invoice should be conformed to the market value in Spain of the same grade or quality of wine.

9th. That, upon the evidence, the sales of seventeen quarters and thirty octaves of wine to M. Lenau & Co., and the three sales of wine to Simon De Visser, were actual sales in Cadiz by Lacave & Echecopar, at the several prices paid therefor by the purchasers.

The counsel for the claimants requested the court to charge the jury as follows:

1st. There are two questions of fact to be considered: (1) Were these wines undervalued by Lacave & Echecopar? (2) Had they a guilty knowledge that they were undervalued? Before these goods can be condemned, both of these questions must be answered in the affirmative. There must be a guilty undervaluation.

2d. The presumption is that the officers of the government have done their duty, and that these merchants have acted with truth and honesty. These presumptions are to be displaced by the evidence, if at all.

3d. The law requires the actual market value in Cadiz to be stated in the invoice, and the jury must disregard all evidence of sales and prices and profits here, or elsewhere, except in Spain.

4th. The law requires certain evidence of market value to be furnished by Lacave & Echecopar: (1) Their own written statement of the market value, on the invoice, which, until disproved, is to be taken to be true. (2) The official certificate of the American consul at Cadiz, which, until disproved, is to be taken to be true. (3) These are, in contemplation of law, of a very solemn and important character, being required by law to be made at the time of shipment and at the place where the value is to be ascertained, and the consul is to be presumed to have performed his duty as to investigating and

certifying as to the value of the wines, the character of Lacave & Echecopar, and the correctness of their statement on the invoices.

5th. The appraisers, having found the invoice value of these sherries correct, the fact is conclusive, and the jury must return a verdict for the claimants.

6th. If the court shall decline so to charge, then the court is requested to charge, that the certificate of the appraisers here, on the invoices, that the value is correct, is to be taken to be true till it be disproved, and the jury are to presume that the appraisers made the examination which the law imposed upon them as a duty under their official oaths.

7th. The record of the appraisement and the reappraisement has been put in evidence, and the appraisers themselves, including the merchant appraiser, and some of the witnesses examined before them, have also been put on the stand, and their evidence, confirming the result of the appraisement, is evidence of the highest character as to the actual market value, and, until disproved, must be taken to be true.

8th. The actual cost of producing these wines, including a fair manufacturer's profit, is to be considered as evidence tending to show the market value in Cadiz. If there were no direct evidence as to that market value, then the cost of production, with a fair profit, would be good evidence of market value; and, if there be any doubt on the direct evidence, then the proof of cost, with a profit, would tend to remove that doubt.

9th. The proof establishes, that the wines delivered, and to be delivered, in the city of New York, to Wellington & Cox, and others, upon orders communicated to Lacave & Echecopar, were so delivered and to be delivered upon sales actually made here by Miln, or by Galway & Casado, as the factor or factors of the said Lacave & Echecopar, and not upon sales thereof made in Cadiz, by reason whereof the prices, to be paid for said sherries in New York, cannot by the jury be considered, in determining the actual market value thereof in Spain.

10th. It appears, from the evidence, that all sales of wines made in pursuance of the aforesaid orders, were so made by Miln and by Galway & Casado, respectively, in said city of New York, as the factor and factors of the said Lacave & Echecopar, and at the risk of such factor or factors, as guarantors of the proceeds of such sales, and that no titles to such wines passed to the persons giving such orders, until the arrival and delivery thereof in New York by the said factor or factors, who, before making such delivery, were entitled to exact from the purchasers payment thereof, according to the terms and conditions of sales; by reason whereof, the prices to be paid upon such sales must, by the jury, be disregarded, in ascertaining the market value of said wines in Cadiz.

11th. The said Lacave & Echecopar acted

In the double capacity of manufacturers of the said wines, and also as merchants and shippers for the exportation and sale thereof, and were under no obligation to sell any part of the same in the market of Cadiz and might lawfully there make contracts for the sale and delivery of said wines in the city of New York, at such prices, payable in said city, and for such profits, as they could obtain, however much these might be beyond the actual market value of the said wines in Cadiz; and neither such prices nor profits payable in New York, can by the jury be considered, for the purpose of arriving at the actual market value of said wines in Spain.

12th. The revenue laws of the United States do not assume to dictate under what conditions a foreign manufacturer shall dispose of his property, nor to what countries it shall be shipped. It was perfectly proper for the claimants in this case, if they saw fit, to refuse to sell their wines in Spain, but it was nevertheless their duty to state, in their invoices, the actual market value thereof in Spain, and it is the duty of the jury to determine, from all the evidence, whether that invoice value was correct and true.

13th. If the court shall hold, that the communication to Lacave & Echecopar of orders for wines given by Wellington & Cox and others, and the assent thereto by the former as to prices, constituted agreements in Cadiz, between them and the persons giving such orders, for the sale of the wines mentioned therein, then the court is requested to charge, that, inasmuch as such wines were, by the terms of such orders and agreements, to be delivered to said persons in New York at a certain price per gallon, free of all duties, charges, and risks; the sum there to be paid, being home and not foreign value, cannot, by the jury, be regarded, in determining the actual market value of said wines in Cadiz.

14th. The government insists, that said orders for a price payable in New York, were not in reality sales here, but were, in fact, sales made in Cadiz, and at Cadiz prices, and that such sales were, therefore, intended as frauds upon the revenue laws of the United States, and to cover up and conceal the actual market value of said wines in Cadiz. On this point, the court is requested to instruct the jury, that fraud must be proven and cannot be presumed, and that, from the evidence, it appears, that all risks concerning the said wines, and all expenses and duties payable thereon, from the time the same left Cadiz until they were delivered, in New York, to the persons giving said orders, were borne and paid, not by the said persons, but by Lacave & Echecopar, who, in consideration thereof, might lawfully charge and receive such profits as they could obtain beyond the actual market value of said wines in Cadiz, by reason whereof the jury must, in determining the market value thereof at that place, entirely disregard the prices paid therefor in said city of New York.

15th. If the court shall decline to give the instruction last above prayed, then the court is requested to charge the jury that, before they can find that the sales or contracts of sale, under said orders, were shams or covers for the purpose of defrauding the revenue, as above suggested, they must be satisfied, from the evidence, that such sales or contracts were, in fact, made upon the understanding, between the said Lacave & Echecopar and the persons giving such orders, that the wines so ordered were to be the property of, and at the risk of, the persons ordering the same, from the time they were delivered on board, in Cadiz, until they should arrive in the city of New York, and must also be satisfied, from the evidence, that the agreements to deliver the said wines in New York at $1.10 per gallon, free of all duties and charges, were shams and fraudulent covers for the unlawful purpose aforesaid.

16th. The court is also requested to charge, that the jury cannot, for the purpose of determining whether the said sales or contracts were mere shams or covers for the fraudulent purpose aforesaid, consider, as evidence, the prices agreed to be paid for said wines in the city of New York, such fact being, upon that issue, wholly immaterial.

17th. It being admitted, by the government and the claimants, that all the wines under seizure left Spain for New York the property of Lacave & Echecopar, who obtained them by manufacture, the invoices accompanying the same are required by law to contain the actual market value of the merchandise at the time and place of manufacture.

18th. It is the duty of the jury to ascertain, first, the time and place of manufacture; next, the market value of the wines under seizure, as an article of commerce, at such time and place; and, then, whether the prices stated in the invoices presented at the custom house conform to such market value.

19th. If the jury find that the prices stated in the invoices do conform to the market value of the merchandise as an article of commerce, at the time and in the country of manufacture, then it is immaterial what may be the ultimate actual receipts of the shippers upon sales of the wines delivered in New York, free of all costs and charges; because, the revenue law only contemplates, in respect to invoice value, transactions of purchase and sale in the markets of Spain.

20th. If the jury find that any of the wines under seizure, or similar wines of Lacave & Echecopar, were not sold in the markets of the place of manufacture, or subjects of general commerce there, then they are at liberty to consider the value, at the same time and place, of the wines of other houses or

manufacturers, of similar grade, quality, and character, in order to ascertain the correctness of the invoices in controversy, and. if there be no such similar wines, then the sum which it cost Lacave & Echecopar to produce the wines under seizure, with a fair manufacturer's profit added.

21st. If the jury believe, that the parcels of wine marked P. & A. 1 and P. & A. 2, were invoiced at their real value in the actual markets of the place, and at the time, of manufacture, then neither they nor the invoice containing them is liable to condemnation; and the statement of higher prices sent to Miln is of no consequence in this case, unless the jury shall believe that the prices mentioned are not mere pro forma prices on which to effect sales in New York, but the actual market prices in Cadiz.

22d. Until the jury find that the wines under seizure were invoiced at less than their actual market value at the time and place of their manufacture, they cannot take into consideration any evidence in the case respecting, (1) the Mansanilla octave; (2) the Barnard cask of sherry; or (3) the De Visser transaction.

23d. In respect to the Lenau transaction, Booraem, who purchased the wine in New York, having testified that he is perfectly familiar with the Crown sherry, and that the latter is unlike the wine referred to, which he purchased of Lenau, it is the duty of the jury to compare the evidence of Booraem with the testimony of Escoura (whose attention was not called to the Lenau wine), and determine whether the two wines are the same; and, if the jury find they are not, or if they find that said wines were sent to New York on consignment, and not upon a sale in Cadiz at the risk of the buyer, then this transaction must be entirely excluded from consideration.

24th. If the house of Lacave & Echecopar believed that the letters purporting to be signed by Samuel D. Jones contained a regular mercantile proposition for a purchase of their Crown sherry wines, and if the house of Lacave & Echecopar answered this proposition, and fixed certain prices as those for which they would sell the same for export, then the jury are at liberty to infer that they would have sold the same wines to any body at the prices named, and also to infer that there was a market value thus made and fixed by the house of Lacave & Echecopar itself, and that such market value was as low as the price thus fixed, after deducting therefrom the cost of removing said wines from Cadiz, and placing them on board vessels in that port, for transportation to New York.

25th. The court is also requested to charge, that substantially the same remarks and instructions as last above given are also applicable to the letters to and from the house of J. Bensusan & Co., and to the prices named by them for the said wine.

26th. The court is also requested to charge the jury, that there is affirmative evidence in the cause, that the houses of Lacave & Echecopar and of J. Bensusan & Co., when they respectively answered the propositions contained in said letters, believed that the same were real proposals for the purchase of wines by a person desirous of buying the same for exportation to Canada, and no proof whatever to the contrary.

27th. If the houses of Lacave & Echecopar, and of J. Bensusan & Co., supposed, in answering the letters purporting to be signed by Samuel D. Jones, that they were written by a person who wished to become a customer in the ordinary way of trade, and if, in reply, they named their prices for cash for export for considerable quantities of said wines, it does not detract a particle from the value of the evidence, as evidence of market value in Cadiz, that neither Jones nor Farwell, in fact, intended to buy, and that the letters written in the name of said Jones were, in fact, written to obtain evidence to be used for the United States; because, the test to be applied is the state of mind of Lacave & Echecopar, and of J. Bensusan, at the times respectively when they wrote the letters stating prices, in reply to those purporting to come from the said Jones.

28th. Who and what the witnesses Henshaw and Marshall are, and the general credit to be given to their testimony, in your view of their examination and cross-examination, is left entirely to you; for, of all this you are the exclusive judges.

29th. If the jury shall find, under instructions from the court in matters of law, or in any other way, that the invoice valuations of the wines under seizure did not conform to the value of such wines in the actual markets of the country of production, as required by the revenue laws of the United States, still they cannot return a verdict for the government, unless they shall also find that such discrepancy was not the result of honest error on their part, in respect to matters of law or fact, but was made knowingly, with guilty knowledge, with design to evade the payment of duty which they knew was legally chargeable on the merchandise.

30th. The court is requested to charge the jury, that they cannot, for the purpose of ascertaining the market value, in Cadiz, of these wines, consider the sum for which they were insured in the city of New York, by the direction of Lacave & Echecopar.

31st. The court is also requested to charge, that the De Visser transaction, the Mansanilla and Barnard transactions, and the other transactions proven, in which duties were to be paid by those in this country to whom the wines were sent, having been introduced in evidence by the government for the purpose of showing intent, are entitled to little or no weight for that purpose, because La-

cave & Echecopar had no motive to undervalue the said wines.

Wm. M. Evarts, W. G. Choate, and Ethan Allen, for the Government.

E. W. Stoughton, E. C. Benedict, and Webster & Craig, for claimants.

BLATCHFORD, District Judge (charging jury). Gentlemen of the Jury: The commendable attention and unwearied patience which you have manifested throughout this trial, the first steps in which were taken thirty-five days ago, and on which we have bestowed consideration now for twenty-two days, are commensurate with the zeal, and care, and distinguished ability with which the case has been presented to you by the learned counsel upon both sides, and with the importance of it to the parties, and with the magnitude of the principles involved in it. It concerns 1,826½ quarter casks of wine, amounting in the aggregate, to 73,060 gallons, and the value of which, to day, in this market, at the rate of $1.10 in gold per gallon (allowing for a premium upon the gold) is about the sum of $112,000. This statement measures merely the pecuniary value involved in this controversy. It is a measure of that pecuniary value, because, if the goods seized are forfeited, the owners lose that amount; but it is far from being a measure of the principles involved in the controversy. They reach and extend (as you have been advised by the counsel upon both sides, in the course of this case, and as appears somewhat in the evidence) to other importations, and to other seizures of the same character of goods. Now, as you recollect, the mass of the wine in this case is invoiced at the rate of $16 per quarter cask, the only exception, I believe, being the case of the two quarter casks called the Paris & Allen, or the P. & A. wine, one of which was invoiced at $22, and the other at $30 per quarter cask. The invoices which are alleged on the part of the government to have been false and fraudulent, were all of them sworn to by one of the persons, who, it is admitted on both sides in this case, were the owners of the wine—one of the firm of Lacave & Echecopar. Therefore, the case, although involving such a large amount of property, becomes very simple in that aspect of it, and is no more complicated in respect to the ownership, the entry and the rate of valuation in the invoices, than if it covered only a single invoice of one quarter cask of wine, valued at $16.

On the part of the government, it is claimed in this case, that there has been a systematic series of undervaluations of these wines by the manufacturers of them, an intentional and wilful undervaluation, resorted to because of the ad valorem system of duties provided by law in regard to the wines; and the government claims that it was resorted to with full knowledge on the part of the owners, Lacave & Echecopar, of what the law required, and of the values which they ought to state in their invoices. The government claims that the invoices are below the actual market value of the wines in Cadiz. Throughout the observations which I may make to you, I shall speak of value in Cadiz: for, although the law speaks of value in the principal markets of Spain, yet it is conceded, on both sides, for the purposes of this trial, that actual market value in Cadiz is the proper test, because Cadiz is the principal market for these wines, and it does not appear that there is any other port from which these wines are exported, or in which they are largely dealt in, in the manufactured and completed state in which they are found ready for shipment. On the part of the claimants it is contended, that these wines are not valued in the invoices at a price under the actual market value, but that they are valued at a price fully up to the actual market value in Cadiz. That is the issue between these parties, and, subject to the observations in regard to the law, which I shall make to you, the question is wholly one of fact for you to determine. I shall make no comments upon the evidence, but shall leave the decision of the questions of fact involved entirely to your unbiased judgment, satisfied that the close attention which you have paid, throughout the trial of the cause, to the testimony as given, and to the elaborate arguments of the counsel on both sides, has fitted your minds for a proper consideration of the questions of fact which you are to decide.

The information is founded upon three statutes of the United States—the act of March 2, 1799 (1 Stat. 637), the act of May 28, 1830 (4 Stat. 409), and the act of March 3, 1863 (12 Stat. 737). But the counts under the act of 1799 may be laid entirely out of view. The 66th section of the act of 1799 covers only the case where property ought to be invoiced at its actual cost, which, under the law as it now stands, is only where the property is imported by the purchaser of it. Therefore, the case is presented for your consideration as if the counts under the act of 1799 were not in the information, and as if the information were founded solely on the other two statutes,—the fourth section of the act of 1830, and the first section of the act of 1863. The provisions of these two statutes I will now state to you. So far as they apply to this case, they are very simple.

By the fourth section of the act of 1830, it is provided that if an invoice be made up with an intent, by a false valuation, or false extension, or otherwise, to evade or defraud the revenue, the goods contained in the entry made on such invoice shall be forfeited to the United States. The other statute counted upon is the first section of the act of March 3, 1863, which provides, that if any owner of any merchandise shall knowingly make, or attempt to make, any entry thereof by means of any false invoice, or of any in-

voice which shall not contain a true statement of all the particulars required by that section, the merchandise shall be forfeited. The only material and substantial apparent difference between these two statutes is, that the one speaks of making up an invoice with "intent to evade or defraud" the revenue, and the other speaks of "knowingly" making an entry by means of a false invoice. "Intent to evade or defraud" is the wording in the one case; "knowingly" in the other. I shall have occasion further on in my remarks, to call your attention to those two expressions in the two statutes. The act of 1863, as I have just read to you, defines the offence to be, knowingly entering or attempting to enter goods upon a false invoice, or upon an invoice which does not contain a true statement of all the particulars required by that act. What are the particulars required? So far as they apply to the present case, they are these: If the merchandise is obtained in any other manner than by purchase (and, in the present case, there is no dispute in regard to the fact that the merchandise was not obtained by purchase, for Lacave & Echecopar did not purchase any of the wines that are under seizure, in the state in which they are now found as an article of merchandise), the invoice must state the actual market value thereof, at the time and place when and where the same was procured or manufactured. On the other hand, if the merchandise is obtained by purchase, the invoice must contain a true and full statement of the time when and the place where the same was purchased, and the actual cost thereof, and of all the charges thereon, that is, the actual cost thereof to the person who so purchases it in a condition ready for shipment, and undertakes to enter it in that condition. These two provisions are very plain and simple. If the merchandise is obtained in any other manner than by purchase, the invoice must state the actual market value thereof at the time and place when and where the same was procured or manufactured. But, if the merchandise was obtained by purchase, then the invoice must contain a true and full statement of the time when and the place where the same was purchased, and the actual cost thereof, and of all the charges thereon. The policy of these provisions of the law has been somewhat commented upon and stated to you by the counsel for the government. It must at once be apparent to you why this system was adopted. It appears first in our statutes in 1823. Prior to that time there was no such distinction between goods purchased and goods not purchased; but congress, in its wisdom, probably because of the course and exigencies of trade at that time, introduced this distinction into the revenue laws. The reasons were manifestly these: Every ad valorem system of revenue must be made, as far as possible, uniform in its operation, or it will be oppressive and unjust. Merchandise, as a matter of course, will be shipped to this country by the man who manufactures it, and like merchandise will be shipped here by the man who purchases it. If the manufacturer is allowed to invoice his merchandise at what it costs him to make it, and the purchaser is compelled to invoice his goods at what it costs him to buy them, inasmuch as the purchaser must pay for the goods not only what it costs the manufacturer to make them, but the profit of the manufacturer in addition, an unfair discrimination is made against the purchaser, enabling the manufacturer to undersell him in the market here, and in the end surely drive him out. This is a principle which is easy to be understood, and commends itself to the good sense of every one. Hence the rule referred to, and which finds its expression in the language which I have cited from the act of 1863. In the case of a purchaser of goods, the cost to him to buy the goods abroad, is assumed, as a general rule, by the law, to indicate the actual market value of what he buys, it being presumed that he buys at the ordinary actual market value; and to put the purchaser upon the same footing with the manufacturer, to make no unjust discrimination against the purchaser, and in favor of the manufacturer, and to enable the government to collect substantially the same amount of duty, at the same ad valorem rate, on the same quantity of the same description of merchandise, whether shipped here for account of the purchaser of it or for account of its manufacturer, the law requires the manufacturer to invoice his goods, when he imports them and enters them here as his own, at their actual market value in the principal markets of the country where they were manufactured; no matter what their cost to him, no matter whether they cost more or less than such actual market value—in substance and effect, it requires the manufacturer to invoice them at what the purchaser would have to pay for them, and invoice them at. That is the theory of the law and the object of the law; and its language endeavors to carry out that theory and object, as far as it is possible for human legislation to carry out a principle.

It being, therefore, the admitted duty of Lacave & Echecopar, as the manufacturers of these wines, to invoice them at their actual market value at Cadiz, the place of their manufacture, at the time of their manufacture, the question next presented for consideration is—what is the meaning of the words "actual market value," in the statute? It has already appeared, in the course of the remarks addressed to you by the counsel in this case, that the language of the acts of congress on this subject is somewhat variant in the actual words used. Some of the statutes use the expression "market value," some use the expression "fair market value," some use the expression "actual market value." But there is no substantial difference, nor has there ever been, in meaning, in these various expressions. The statute which

says "fair market value," means "actual market value"; and the statute which says, "actual market value," means "fair market value." The only other possible meaning of the word "actual," is that which I suggested early in the trial, namely, value in the actual market, as contra-distinguished from a hypothetical, or notional, or ideal value, which may be affixed to an article in a particular case, for a particular reason. In other words, the common sense of every man must be applied to this expression, as it is to all the other transactions of life. Whatever men in the ordinary dealings of society, between man and man, would consider to be the fair actual market value of property, that is its actual market value, within the meaning of the revenue laws. But, independently of this, we have the authority of the supreme court of the United States, as to the meaning of the words "actual market value." In a case which came before that court (Cliquot's Champagne, 3 Wall. [70. U. S.] 114), brought up from California, in regard to the seizure of some champagne wine, the district court, on the trial of the cause, gave an exposition of the meaning of the words "actual market value," in the statute of 1863; and the supreme court say, that the charge of the district judge embraced all the points in the case, and is satisfactory to the supreme court, and they concur in it. According to that decision, the meaning of the words "actual market value," is the price at which the owner or the manufacturer of goods holds them for sale: the price at which he freely offers them in the market; such price as he is willing to receive for them if they are sold in the ordinary course of trade. The particular language of the district judge in that case (which was so emphatically sanctioned by the supreme court) was, in substance and almost in words, what I have just stated to you.

That being the law, the next question is—what is the evidence as to actual market value? Both sides have gone into evidence as to whether the price of $16, stated in these invoices as the actual market value of these wines in Cadiz, and sworn to by Mr. Lacave, in his oath upon the back of each one of these invoices, to have been the actual market value of the wines in Cadiz, was really the actual market value. The government claims to have shown that the market value in Cadiz at the time was largely in excess of the value so stated by Mr. Lacave in the invoices, while the claimants insist that the evidence shows that the price of $16 is fully up to the market value, and, in fact, according to their views of the case, is a little in excess of it. The issue, therefore, reduces itself to one of fact, so far as the question of market value is concerned.

It is necessary, now, that I should call your attention to one or two legal propositions that are involved in the consideration of some portions of the evidence. The counsel for the government claim, on their side, that they have four lines of evidence upon this question of market value: (1) The sales on orders, deliverable on the wharf in New York, at $1.10 per gallon. (2) The sales to Lenau, which are claimed to have been at 75 cents per gallon, and the price named by Lacave & Echecopar to Melchers, which the counsel for the government claim is shown, by the evidence, to have been 75 cents per gallon, and for Crown sherry. (3) The insurance of the wines at 70 cents per gallon, by direction of Lacave & Echecopar. (4) The testimony of the experts on the part of the government, Mr. Marshall and Mr. Henshaw, and other testimony, if there be any of that character. On the part of the claimants, the principal evidence, so far as I now recall it, on the question of market value, is: (1) The letters of Lacave & Echecopar to Mr. Jones, and the offer contained in those letters. (2) The like correspondence on the part of Mr. Bensusan with Mr. Jones, and his offer of wines to Mr. Jones, wines which the claimants say were, substantially and in fact, Crown sherry. (3) The expert testimony of Mr. Bensusan, Mr. Escoura, Mr. Lenau, and perhaps some others, as to the actual market value of the Crown sherry in Cadiz. These represent, I think, substantially, the classes and ranges of evidence claimed by the respective parties in this case to be applicable to this subject.

In regard to the sales on orders received here by Mr. Miln, and transmitted by him to Spain, the wine being sent back in response, delivered here on the wharf, and paid for at the rate of $1.10 per gallon in gold, you have heard the views of the respective counsel; but, in order to enable you to apply the facts, it is necessary for me to state to you what the law is upon the subject. It is this: If you shall find, upon all the evidence in regard to the transactions respecting wines ordered in this way, and delivered here on the wharf at the price of $1.10 gold, per gallon, that the course of business adopted by the claimants, of selling their wines at that price, and thus deliverable on the wharf in New York, was a mode of business adopted for the purpose of concealing the real prices of the wines at Cadiz, then you will be authorized to find that sales upon such orders were sales at Cadiz prices; and, in such event, the prices, which, from the evidence, you shall ascertain to be such Cadiz prices (by deducting from the $1.10 the expenses of freight, insurance, duties, and whatever other charges upon the same are shown to be properly deductible, from the time of the shipment of the wines in Cadiz to their delivery in New York), may be properly taken into consideration by you in ascertaining the actual market value of the wines in Cadiz at the time. But if, on the other hand, you shall find, upon all the evidence, that the course of busi-

ness adopted by the claimants, of selling these wines on orders, at $1.10, deliverable upon the wharf in New York, was not adopted for the purpose of concealing the real prices of the wines in Cadiz, then you will throw entirely out of consideration every thing in regard to the price of $1.10, because it will then have nothing to do with the case. It will then be the price here in the New York market, and will not be a Cadiz price.

With that single observation in regard to the law applicable to the $1.10 transactions, showing to you under what circumstances you are at liberty to consider the evidence as to the $1.10 price as bearing upon the question of market value, and under what circumstances you are not to consider it as bearing upon that question, I shall leave the entire evidence in the case to you, without any comment upon it, for your decision and determination, as bearing upon the question of actual market value. If you shall find, as matter of fact, that the invoice value was as high as the actual market value, then there is an end of the case, and you must find a verdict for the claimants; but, if you shall find that the invoice value was lower than the actual market value, then you will have to proceed to the consideration of another question—whether, under the act of 1830, that undervaluation was made with intent to defraud the revenue; and whether, under the act of 1863, it was made knowingly or unknowingly. Upon the question of knowledge or intent, I have stated to you the verbal difference in language between the two statutes —the one requiring an intent to evade or defraud the revenue, and the other requiring that the party should knowingly make, or attempt to make, an entry by means of a false invoice. That, however, is merely a verbal difference. There is no real difference in the meaning of the two expressions, as has been decided by the supreme court of the United States. In the case of Cliquot's Champagne [supra], to which I have already referred, respecting the champagne wine, which went up from California, on the trial before the district court, the court was requested, by the counsel for the claimants, to charge the jury, "that the word 'knowingly,' in the first section of the act of March 3, 1863, means, in connection with the language which accompanies and surrounds it, 'fraudulently.'" The district judge refused to give that instruction, and held that such was not the law, and his charge on that subject was approved by the supreme court, to which the case went, and which affirmed the judgment, in these words: "The court below was pressed to instruct the jury that 'knowingly' is used in the statute as the synonyme of 'fraudulently.' The instruction given was eminently just, and we have nothing to add to it." We have seen what the instruction was that was refused. Now, what were the instructions that were given? I shall read them to you as the instruction of this court

upon this subject: "With regard to the question of intent, I am asked to charge you that you should be convinced that these goods, if invoiced below their market value, were invoiced fraudulently below their market value. The previous statutes passed by congress had introduced, in many instances, the word 'fraudulently,' had defined the offence to be, making a false invoice 'with intent to defraud' the revenue, or evade the payment of duties." The learned judge here refers to the passage read to you from the act of 1830, He proceeds: "This statute," the statute of 1863, "apparently, ex industria, omits these expressions, and substitutes the words 'if the owner,' &c., 'shall knowingly make an entry by means of any false invoice,' &c. I do not feel at liberty, when the legislature had left out the word 'fraudulent,' and inserted the word 'knowingly,' to reinstate the word 'fraudulent.' At the same time, I am bound to say, that I cannot conceive any case where an entry could be knowingly made by means of a false invoice unless it were fraudulently made. I do not tell you, in terms, that you are obliged to find that the entry was made fraudulently, but you are obliged to find that it was made knowingly, by means of a false invoice; and, for myself, I cannot imagine any case where it could be knowingly done, without being fraudulently done. What, then, shall we understand by this word 'knowingly,' as here employed? It is that, in making out this invoice, and in swearing before the consul that such was the actual market value of the goods, the claimant knew better, and that he was swearing falsely. He forfeits these goods, if you believe that he knew this invoice did not express their market value, their actual market value."

One of the earliest statutes of the United States uses language which is the true exposition of these laws upon this point. The eighty-fourth section of the act of March 2, 1799 (1 Stat. 694), in speaking of the forfeiture of goods under certain circumstances, provides, on the question of intent, that they shall not be forfeited where it is shown that the transaction took place "by mistake or accident, and not from any intention to defraud the revenue." That is the true distinction. Where an undervaluation is shown, unless it is shown to have occurred by mistake or accident, it follows inevitably that the undervaluation must have been made with intent to defraud the revenue. On that subject, I quote the words of a very learned judge, who adorned the bench for many years, and was particularly conversant with this class of cases,—Judge Hopkinson, of the Pennsylvania district,—and who, in a prosecution of a similar kind (U. S. v. Twenty-Five Cases of Cloths [Case No. 16,563]), gave the same view of the law that I have now given to you. He says: "Supposing that you shall find that these goods are undervalued in the invoices, how are you to decide upon the fraudulent intent or design? In doing this, you will be

influenced by the extent of the undervaluation. Is it enough to have been a temptation to fraud? Could it, on a large business, afford a great profit? Does it run generally through all the invoices, or is it only an occasional undervaluation, that might have happened by accident, by mistake, without any design?" That shows the view of this learned judge as to the true test of this question of intent. Was it by accident or mistake, on the one hand, or by design on the other? If it was by design or intent, then it was not by accident or mistake. If it was by accident or mistake, then it was not with intent or design.

On this question of knowledge and intent, and only upon this question, there comes into this case the evidence which has been introduced on the part of the government, whatever you may think it to be, growing out of the letter of Lacave & Echecopar to the United States consul at Cadiz, in March, 1864, the correspondence with Mr. Miln, comprising the letters and invoices about the price of the P. & A. wine, and the transactions, which have been commented upon on both sides, with Mr. Lenau and Mr. De Visser, and the one or two instances of wine sent to Mr. Barnard, in Boston, and perhaps some other matters that I have not borne in mind. But all those other instances, whatever they may be (whether the true view of them is as claimed by the government, or as claimed by the defence), in regard to wine not under seizure, have nothing to do with this case, unless you shall find that there is an undervaluation, and shall come to the question of intent or knowledge.

It now becomes my duty, and, although a rather tedious one to you, it is, nevertheless, a duty that I owe to the case and to the parties, to go over, patiently and carefully, the requests to charge that have been made by the counsel on both sides. There are nine requests on the part of the government, and thirty-one on the part of the claimants. I must ask you to bear with me, because it is a part of your duty, and of mine. As we have tried this case so far with patience and care, it is important that, in its closing hours at least, there should be no error or prejudice to either side, through negligence or haste.

The counsel for the government ask me to charge the jury: "(1) That, upon the evidence given by the claimants, the probable cause of condemnation has not been relieved, and the jury will find a verdict for the United States." Upon that I charge you, that the whole question is one for the jury, and one which I shall not take away from you.

The government also asks me to charge: "(2) That the sales upon orders, at $1.10, deliverable upon the wharf in New York, are sales at Cadiz prices." That is a question for the jury, under the exposition of the law upon that subject, which I have stated to you, and I shall not take it from the jury.

"(3) That the sales upon orders, at $1.10, deliverable on the wharf in New York, are evidence upon which the jury may find the actual market price in Cadiz, by deducting therefrom freight, insurance, duties, and other custom house charges, and the expense of bringing the wine to the place of delivery." On that subject I have already charged you fully.

I have also charged you substantially in accordance with the fourth proposition on the part of the government, which relates to this question of $1.10.

The fifth proposition on the part of the government also relates to the question of $1.10, and is covered by what I have already stated to you on the subject.

The sixth proposition is this, and I charge you that it is law: "(6) That if the wines under seizure were entered by means of invoices not truly expressing the market value of the wines at the time when, and in the country where, they were manufactured, with knowledge upon the part of the consignor, or of the consignee, that the invoices did not contain such actual market value, the goods are forfeited, and the jury must find for the United States."

So, also, I charge you that the seventh proposition on the part of the government is correct: "(7) That if the jury find, upon all the evidence, that the invoices do not contain such actual market value as aforesaid, and were made up by Lacave & Echecopar with intent to evade the payment of any part of the duties by law chargeable thereon, the goods are forefeited, and the jury will find for the United States."

The eighth proposition, also, I charge you is correct: "(8) That the market value to which the manufacturer of wine is required to conform the valuation of his invoice, is of wine of the same grade and quality, as a general article of production and commerce in Spain, and that a manufacturer cannot escape the obligation to conform his invoice to that general market value, by the pretence or the fact that he does not offer his particular brand of wine in the market of Spain, but sends it in exportation; but, in such case, the valuation in the invoice should be conformed to the market value in Spain of the same grade or quality of wine." The only observation that I have to add upon that subject is in reference to that small portion of this wine, small in proportion to the rest, which has been called, throughout this trial, "Burgundy Port." Some evidence has been given, on the part of the government, in regard to the market value of that wine, and some evidence on the part of the claimants. Among the evidence given on the part of the claimants, and admitted by the court, in regard to the value of Burgundy port in Spain, is the evidence as to its cost, and as to a fair manufacturer's profit on that cost, and as to what the sum total of the cost and manufacturer's profit is, with reference to

.the $16. And, upon that subject I charge you, that you have a right to consider that ·evidence in regard to Burgundy port, in arriving at the determination of the actual ·market value of the Burgundy port in the market of Cadiz. But similar evidence was excluded by the court, and is not to be taken into consideration by you, upon the question of the actual market value of the sherries; and, under the word "sherries" I .include not only the Crown sherries, but the .Madeiras and the P. & A. wines, and whatever else there may .be in the· case, except ·the Burgundy port, which latter includes the wine called "pure juice." .As to this Burgundy port, it is not sherry. It is all invoiced at $16. It is sometimes marked "pure juice" ·on the margin ·of the invoices, and sometimes "Burgundy Port," but, in all cases, ·whether it is marked as "pure juice" on ·the margin, or "Burgundy Port" on the margin, it is, in the body of the invoice, called ."common Spanish red wine." It will be for the jury to judge, on the evidence, as to .what this wine is, what is its quality, body, .market value, appreciable worth, identity, .and character.

The last proposition on the part of the government is: "(9) That, upon the evidence, the sales of the seventeen quarters and thirty octaves of wine, to M. Lenau & Co., and the three sales of wine to Simon De Visser, were actual sales in Cadiz, by Lacave & ·Echecopar, at the several prices paid therefor by the purchasers." On that subject I charge you, that it is a question entirely for .you, and for your consideration only ·upon the question of knowledge or intent, after you shall have arrived at the conclusion, if you do arrive at it, that the wines are in fact invoiced at less than their actual market value.

I now take up the requests on the part of the claimants. The first proposition is correct, and I charge you in accordance with it: ":(1) There are two questions of fact to be considered: 1st. Were these wines undervalued by Lacave & Echecopar? 2d. Had they a guilty knowledge that they were undervalued? Before these goods can be condemned. both of these questions must be answered in the affirmative. There must be a guilty undervaluation." On that subject I will read to you what was said by the supreme court of the United States, in the same champagne case from· California: "The term knowingly, in the act of 1863, in the connection here under consideration, refers to the guilty knowledge of the owner, consignee, or agent by whom the entry is made. or attempted to be made. The offence to be punished consists of three particulars: (1) The making, or attempting to make, an entry by the owner, consignee or agent. (2) The use, by such owner, consignee. or agent, of the forbidden means. (3) Guilty knowledge on the part of such owner, consignee, or agent. This, we think, is the proper construction."

Now, the supreme court have given no definition, nor does the request to charge, which I ·have complied with give any definition of the· words "guilty knowledge." But "guilty knowledge," under the circumstances of the case, means no more than "knowledge." If the party knew better, if he knew that the ·invoice value was lower than the real value, ·or if he put in a lower value with the intent to evade or defraud the revenue. then his knowledge and intent were guilty.

The second request on the part of the claimants has, in my judgment, nothing to do with this case, and I decline to give it.

The third request is correct; and I· charge you in accordance with it, subject to the remarks I have heretofore made in respect to the question of $1.10: "(3) The law requires the actual market value in Cadiz to be stated in the invoice, and the jury must disregard all evidence of sales and prices and profits here, or· elsewhere, except in Spain." That is true. All prices, everywhere, except in Spain, ·are to be disregarded, and it is only in case you find that the $1:10 ·was really a price in Spain, that it is to be taken into consideration. Otherwise, it is to be thrown out of view; and. therefore, in any event, the prices that you are to consider are to be prices in Spain, and you· are not to consider the $1.10 price at all, unless you find that it is a price in Spain.

As to the fourth, fifth, sixth, and seventh requests of the claimants, they relate to the official papers in this case. the certificates of the consul, the appraisements, the reappraisements, and the acts of the custom house officers, and I decline to charge as requested by these prayers. But I charge that you may take into consideration, as a part of the evidence in the case upon the question of market value, as it shall affect either side, the invoice. the entry, the certificate of the consul. the oath of Mr. Lacave. the oath of Mr. Miln on the entry, the appraisement by. the appraisers, the certificate of the appraisers on the invoice as to the value, the examination made by the appraisers, the testimony given before the appraisers, and the entire record of the appraisement and of the reappraisement. every thing there is in the official papers respecting the appraisement and the reappraisement. You may take all this into consideration, as a part of the evidence, on the question of fact as to the market value of the wines in Cadiz.·

In regard to the eighth request to charge, I decline to charge as there requested. I have already stated to you, in respect to the question· of Burgundy port, all that there is on that subject in the eighth request, that is, in my judgment, relevant to the case.

I .decline to charge as requested in the ninth. tenth, and eleventh prayers of the claimants.

The twelfth prayer is correct. and I charge you in accordance with it. subject to the remarks I have already made in regard to the

question of the $1.10: "(12) That the revenue laws of the United States do not assume to dictate under what conditions a foreign manufacturer shall dispose of his property, nor to what countries it shall be shipped. It was perfectly proper for the claimants in this case, if they saw fit, to refuse to sell their wines in Spain, but it was nevertheless their duty to state, in their invoices, the actual market value thereof in Spain, and it is the duty of the jury to determine, from all the evidence, if that invoice value was correct and true." That is a sound proposition, subject to the remarks I have made in regard to the $1.10 price, and to the question whether it was a cover or not.

I decline to charge in accordance with the thirteenth, fourteenth, fifteenth, and sixteenth prayers.

The seventeenth prayer is correct, and I charge you in accordance with it: "(17) It being admitted by the government and the claimants that all the wines under seizure left Spain for New York the property of Lacave & Echecopar, who obtained them by manufacture, the invoices accompanying the same are required by law to contain the actual market value of the merchandise at the time and place of manufacture."

I also charge you in accordance with the eighteenth prayer: "(18) That it is the duty of the jury to ascertain, first, the time and place of manufacture; next, the market value of the wines under seizure, as an article of commerce, at such time and place; and, then, whether the prices stated in the invoices presented at the custom house conform to such market value."

The nineteenth proposition comes back again to the $1.10, and I charge you that it is correct, subject to the remarks I have already made on the subject: "(19) That if the jury find that the prices stated in the invoices do conform to the market value of the merchandise as an article of commerce at the time and in the country of manufacture, then it is immaterial what may be the ultimate actual receipts of the shippers, upon sales of the wines delivered in New York free of all costs and charges; because, the revenue law only contemplates, in respect to invoice value, transactions of purchase and sale in the market of Spain." That, as I have stated before, is true; and, unless the $1.10 price shall be found by you, upon your view of all the facts in regard to it—the $1.10 upon order sales—to be referable to the market of Spain, then it has nothing to do with the case, and how much money went back to the pockets of Lacave & Echecopar is immaterial.

The twentieth proposition is also correct, and I charge you in accordance with it: "(20) That if the jury find that any of the wines under seizure, or similar wines of Lacave & Echecopar, were not sold in the market of the place of manufacture, or subjects of general commerce there, then they are at liberty to consider the value, at the same time and place, of the wines of other houses or manufacturers, of similar grade, quality, and character, in order to ascertain the correctness of the invoices in controversy; and, if there be no such similar wines, then the sum which it cost Lacave & Echecopar to produce the wines under seizure, with a fair manufacturer's profit added." That comes back again to what we have had so often, in the course of this trial, that, if there is no evidence as to the market value of these wines, or of wines of a similar grade and quality, derived from actual sales of them, or transactions in regard to them, then you are at liberty to resort to the cost, with a fair manufacturer's profit added, but only in such case.

The twenty-first proposition is correct, and I charge in accordance with it: "(21) That, if the jury believe that the parcels of wine marked P. & A. 1 and P. & A. 2 were invoiced at their real value in the actual markets of the place, and at the time, of manufacture, then neither they, nor the invoice containing them, is liable to condemnation; and the statement of higher prices sent to Miln is of no consequence in this case, unless the jury shall believe that the prices mentioned are not mere pro forma prices on which to effect sales in New York, but the actual market price in Cadiz." It is only as evidence of actual market price in Cadiz that that transaction, that letter, that statement, that paper or invoice, whatever it may be, is introduced into the case by the government; and, if it shall be thought by you, upon all the facts, not to indicate anything in regard to the actual market value in Cadiz, it has nothing to do with the case.

The twenty-second proposition is also correct, and I charge you in accordance with it: "(22) That, until the jury find that the wines under seizure were invoiced at less than their actual market value at the time and place of their manufacture, they cannot take into consideration any evidence in the case respecting (1) the Mansanilla octave; (2) the Barnard cask of sherry; or (3) the De Visser transaction." I have already stated to you that these three things only bear upon the question of knowledge and intent, after you shall have found that there was, in fact, an undervaluation.

The twenty-third proposition is incorrect, and I decline to charge it.

The twenty-fourth proposition is correct, and I charge you accordingly: "(24) If the house of Lacave & Echecopar believed that the letters, purporting to be signed by Samuel D. Jones, contained a regular mercantile proposition for a purchase of their Crown sherry wines, and if the house of Lacave & Echecopar answered this proposition, and fixed certain prices as those for which they would sell the same for export, then you are at liberty to infer that they would have sold the same wines to any body

at the prices named, and also to infer that there was a market value thus made and fixed by the house of Lacave & Echecopar itself, and that such market value was as low as the price thus fixed, after deducting therefrom the cost of removing said wines from Cadiz, and placing them on board vessels in that port, for transportation to New York."

The twenty-fifth proposition is also correct: "(25) The court is also requested to charge that substantially the same remarks and instruction as last above given, are also applicable to the letters to and from the house of J. Bensusan & Co., and to the prices named by them for the said wine." The substance of the last two propositions is, that if Lacave & Echecopar and Bensusan & Co. believed that these were real bonâ fide applications, and if their offers were real and bonâ fide, then you are to take them into consideration as part of the evidence on market value.

The twenty-sixth proposition I decline to charge, as it is a question of fact solely for the jury. That is, it is a question of fact for you, whether the houses of Lacave & Echecopar, and of J. Bensusan & Co., when they respectively answered the propositions contained in these letters, believed that the same were real proposals for the purchase of wines by a person desirous of buying them for exportation to Canada. That is a question of fact for you. I am asked to charge you one way or the other on it, as a question of law, which I decline to do.

The twenty-seventh proposition is correct, and I charge you in accordance with it: "(27) If the house of Lacave & Echecopar, and of J. Bensusan & Co., supposed, in answering the letters purporting to be signed by Samuel D. Jones, that they were written by a person who wished to become a customer, in the ordinary way of trade, and if, in reply, they named their prices for cash, for export, for considerable quantities of said wines, it does not detract a particle from the value of the evidence, as evidence of market value in Cadiz, that neither Jones nor Farwell, in fact, intended to buy, and that the letters written in the name of said Jones were, in fact, written to obtain evidence to be used for the United States; because, the test to be applied is the state of mind of Lacave & Echecopar, and of J. Bensusan & Co., at the times respectively when they wrote the letters stating prices, in reply to those purporting to come from the said Jones."

The twenty-eighth proposition is, that the evidence of the witnesses Henshaw and Marshall, and the general credit to be given to their testimony, on your view of their examination and cross-examination, is left entirely to you, and of all this you are the exclusive judges. That, undoubtedly, is true, and I charge you in accordance with it.

The twenty-ninth proposition is correct:

"(29) That, if the jury shall find, under instructions from the court in matters of law, or in any other way, that the invoice valuations of the wines under seizure did not conform to the value of such wines in the actual markets of the country of production, as required by the revenue laws of the United States, still they cannot return a verdict for the government, unless they shall also find that such discrepancy was not the result of honest error on the part of the manufacturers, in respect to matters of law or fact, but was made knowingly, with guilty knowledge, with design to evade the payment of duty which they knew was legally chargeable on the merchandise." I have already charged you substantially to that effect, and have explained the meaning of the words, "knowledge," "guilty knowledge," "design to evade the payment of duty," "honest error," and all the other expressions used in the request.

The thirtieth request is: "(30) That the jury cannot, for the purpose of ascertaining the market value in Cadiz of these wines, consider the sum for which they were insured in the city of New York, by the direction of Lacave & Echecopar." I charge you upon that subject, that, if you shall find, upon the evidence, that this $1.10 price, on order sales, was a mode of business adopted for the purpose of concealing the real prices of the wines at Cadiz, and therefore shall find that the $1.10 was a Cadiz price, less the proper deductions, then you may take into consideration, for the purpose of ascertaining the market value, this question of insurance, but not otherwise. If you find that the $1.10 on these order sales was not a Cadiz price, but was entirely a New York price, then the insurance has nothing to do with the case; otherwise, it has. And, on the subject of insurance, you will recollect the views that were presented to you by the counsel on both sides, in case you shall, under the instructions of the court, find it to be a proper element in the case.

The thirty-first request I decline to charge. It is substantially to the effect (and I state it because it is necessary to make some remarks upon one expression in it), that the De Visser transaction, the Mansanilla and Barnard transactions, and other transactions in which duties were to be paid by persons in this country upon wines sent, having been introduced in evidence by the government for the purpose of showing intent, are entitled to little or no weight for that purpose, because Lacave & Echecopar had no motive to undervalue the wines. Now, gentlemen, this is a question wholly for you; and, upon this question of motive, which has been argued to you by the counsel for the claimants and by the counsel for the government, as affecting these wines involved in the De Visser, the Barnard, the Lenau and other transactions, the language of the statute of the United States (the act of 1830)

is, that these things are not allowed to be done with the intent to evade or defraud the revenue. It is just as much an offence against the law for a man to violate it with an intent to evade the revenue in any way as it is to do so with an intent to defraud the revenue. But the question of motive is one entirely of fact for you to consider, upon all the evidence in the case.

That disposes of the requests to charge on both sides, and now it is my duty to call your attention to two or three other points in the case, and then I will commit it to your consideration.

It was urged to the court, early in the trial, and overruled by the court, and it has been urged, in summing up, to you, by the counsel for the claimants, with very great earnestness, that great weight is to be given to the fact of the appraisement and reappraisement of these wines, by the custom house, at the price of $16. The court was asked to lay down the law to be, that this appraisement was conclusive; that it ended the question between these parties; that it not merely went to establish the proper rate of duty, but that it condoned any offence; that it was a pardon of any offence that had been committed; that it was a flat bar to any prosecution by the government to forfeit these goods for any fraud that had been committed. Now, gentlemen, such is not the law. The law has been held the other way ever since the earliest revenue law was enacted, time and time again, by all the courts that have ever considered the question, and, according to my apprehension, there is not a decision the other way. The cases on this subject all draw this distinction—and it is one as perfectly appreciable by you as it is by a lawyer—that this appraisement and reappraisement, and all this machinery which you have seen spread out upon the papers here, is for the purpose of getting at the duty, and for no other object. It is to find out the duty. It is a mode of litigation between the parties, the government on the one side and the importer on the other, to find out how much duty is to be paid on the goods; and, when that machinery is carried through by appraisement and reappraisement, and the duties are paid, and the merchandise is delivered, that transaction is settled, so far as the duties are concerned, and the government, afterwards, even though they find that there has been a mistake, cannot recover from any one, by a lien on the goods or by a suit against the individual, any more duty. It is conclusive upon that subject, but only upon that subject. It is not conclusive if a fraud has been committed. It does not condone or pardon any fraud that has been committed by any false invoice, or any knowing, intentional, wilful undervaluation. A forfeiture for fraud can be enforced after appraisement, reappraisement, payment of duty, and delivery of the goods. The appraisement system is for all cases, and ordinarily

presupposes an honest invoice, but a mistaken one, and a payment of too little duty. This subject came up before the same learned judge (Judge Hopkinson), in the case from which I have already cited, in 1840 (U. S. v. Twenty-Five Cases of Cloths), on a seizure of twenty-five cases of cloth. The same ground was taken there, first to the court, as a question of law, and then to the jury, and the judge disposed of it in this way. He says "To invoice the goods below their actual value and cost, and to enter them by that invoice, with design to evade the duties, is, per se, an offence which forfeits them, whether the invoice was afterwards instrumental in the estimation of the duties for that purpose or not. The evidence must follow the issue, and must depend upon the fact to be proved. When the question is whether an importer has paid the duties legally chargeable upon his goods"—and that is not the question in a case of seizure—"it may be enough for him to say, I have paid all that the officers of the government appointed to ascertain them declared to be due, and the question should rest. But, when the inquiry is whether he has been guilty of a specific fraud or not, it would be extraordinary if the acts or opinions of men in reference to another subject, should be conclusive, either for his condemnation or acquittal." And such is the law. If it had so happened in this case, upon appraisement and reappraisement, that these goods here invoiced at $16 the quarter cask, had been appraised at $25, then, upon the theory of the claimants, the government could have insisted that that was conclusive evidence against the claimants, and that the claimants could not be permitted, on this trial, to show that the value was not $25, but was really no greater than $16. The law says, that this appraisement and reappraisement are not conclusive on either side. If they are higher than the invoice, they do not bind the claimant upon the question of seizure. If they are equal to or lower than the invoice, they do not bind the government. This is fair for both sides. But, still farther on in the same case, when Judge Hopkinson came to charge the jury, the matter was pressed on his attention again, and the learned judge says: "It is contended that, as these goods were appraised at the custom house in New York at the invoice prices, that, as they were passed through that custom house on that appraisement, paid the duties according to that appraisement, and were thereupon delivered to the importers, they are now exempted from all further inquiry into their cost or value, not only in relation to the amount of duties legally chargeable on them, but on a prosecution for fraud in making up those invoices, and on any or every other account; that the very fraud by which it is alleged, in this prosecution, the passing of the goods through the custom house was obtained, that is, the false invoices, cannot now be inquired into. I can by no means

assent to this doctrine, which, in my judgment, would be to offer a premium for successful fraud, and punishment only to the unskilful. I adhere, on reflection, to the opinion I gave on the trial. I will add but a remark. It is said these officers are the appointed agents of the government, and that the government is bound by their acts. The answer is plain. The government does not claim any right or privilege for itself that every citizen does not possess. Suppose one of you should appoint an agent to sell your house or goods, with even more clear and full powers than those given to the appraiser by the acts of congress. Your agent makes a sale, but it is afterward proved that he has been grossly defrauded by the purchaser, by false representations, by the suppression of the truth, by that which constitutes fraud in the law. Would you suppose you are bound by such a transaction—that the cheat is safe, and may retain your property only by saying that it was delivered to him by your agent?"

I have deemed it my duty, gentlemen, to make these remarks, because of the very earnest manner in which considerations growing out of the appraisement and re-appraisement at $16, were pressed upon your attention. So, also, a great many remarks were made, in summing up and in the course of the trial, in reference to the laws on the subject of the seizure of goods, the employment of informers, and the seizure of books and papers, none of which questions have any thing to do with this case; and the fact that they have nothing to do with this case is manifest from the fact that, in the thirty-one prayers for instruction, upon the part of the claimants, there is not one which touches any one of these subjects. They have nothing to do with the case. From the year 1793 to the present time—a period of seventy-five years—the law has stood, that the collector and other officers of the revenue, on mere suspicion, may enter into a vessel and search it, and seize the goods and hold them on suspicion of fraud upon the revenue. So, in the act of 1799, section sixty-six, if the collector suspects that goods are not invoiced properly, he may take possession of them. By section sixty-seven, on suspicion of fraud, he may open the goods. By section sixty-eight, he may search suspected places for goods. That has been the policy of the law from the commencement. Fraud could never be prevented or detected but for this high power, which is the prerogative of the sovereign authority of the government, and which is for your protection, and for my protection, and for the protection of every man who wishes to do an honest business, and not to be driven out of it by parties who may commit frauds upon the government. So, also, ever since the act of 1799, the system of informers has been sanctioned; and, by section ninety-one of the act, one-fourth of the proceeds of a seizure is given to the informer. That law

still remains in force, and various laws enacted since, both in regard to customs and internal revenue, all sanction the employment of informers, and give them a share of the proceeds of the property seized. And, more recently, by other acts, additional powers, which must have been conferred for good purposes and from good motives, and, as we must presume, upon sufficient cause, were conferred in certain cases, and under certain restrictions, to seize the books and papers of parties suspected of being concerned in frauds upon the revenue. Therefore, gentlemen, that is the policy of the law, and, it is not to be inveighed against, to influence your minds. It is a part of the law which you are called upon to administer; and, to address to you considerations based upon prejudice against the informer in a case, or prejudice against the seizure of goods, or of books and papers, is, to ask you to take into consideration things which, under your oaths, and under the law as given to you by the court, you have no right to consider, which have no relevancy to the case, and which you have no right to permit in any manner to influence your judgment. You are to consider and decide this case fairly, upon the evidence addressed to the true merits and issues in the cause, which I have explained to you as clearly as it is in my power to do.

There is but one more remark I have to make to you, and that is in reference to the question of the burden of proof. It has been the law upon that subject since the year 1799, enacted by a congress and sanctioned by a president who had to do with the formation of the constitution, and with the creation of our present system of government, and it has remained the law on that subject until the present time, and it was asserted and affirmed no longer ago than December, 1865, by the supreme court of the United States, in the case of Cliquot's Champagne, which I have already cited, where the court say: "It is argued that the rule relating to probable cause and the onus probandi, prescribed in the seventy-first section of the act of 1799, is confined to prosecutions under that act, and has no application to those under the act of 1863, which is silent upon the subject. It would be a singular result, if, in a prosecution upon an information containing counts upon this and later statutes in pari materia, the rule should apply to a part of the counts and not to others. The seventieth and seventy-first sections must be construed together. They both look to future and further legislation. In all the changes which the revenue laws have undergone, neither has been repealed. The authority to seize out of the district of the seizing officer, and this rule of onus probandi, have always been regarded as permanent features of the revenue system of the country." And they affirm the charge of the learned district judge, and his refusal to charge as requested by the claimants in

that case, that the burden of proof was not upon the claimants, but was upon the prosecution. Now the law upon that subject is this—that where probable cause is shown for the prosecution (and, in this case and in all cases it is for the court to decide whether probable cause is shown for the prosecution, and the court decides that there is such probable cause by throwing the claimants upon their defence, as it did in this case),—where probable cause is shown for the prosecution, the burden of proof is thrown upon the claimants to dispel the suspicion, and to explain the circumstances which seem to render it probable there has been a knowing undervaluation. The government, in this case, having established probable cause, it is for the claimants to show their innocence, and dispel and clear up the suspicion which the government, in the beginning, raised against them. Under this rule, it is for you to say, whether the claimants have made out their defence, and have shown that these wines were invoiced at a value as high as their actual market value in Cadiz at the time they were manufactured, or that the failure to so invoice them was the result of accident or mistake, and not of knowledge or intent. If they have not shown that, you will find for the United States, and, if they have shown that, you will find for the claimants.

As I stated before, there are two counts in this information for your consideration—one under the fourth section of the act of 1830, which requires that the offence shall have been committed with intent to evade or defraud the revenue, and the other under the first section of the act of 1863, which requires that the party shall have knowingly made, or attempted to make, an entry by a false invoice, or other false paper. Under the act of 1830, you must find, in order to find against the claimants and in favor of the government, that the invoices were made up with intent, by false valuations, to defraud the government, and, unless, under that act, you so find, the goods cannot be forfeited. Under the act of 1863, the goods cannot be forfeited, unless you find that the entry, or attempt to make the entry, was done knowingly. You can find for the government under either statute, that is, under the counts of the libel under either statute. You may find under the law of 1830, or under the law of 1863. If you find against the claimants under either, the goods are to be forfeited You must find in favor of the claimants under both, to find a verdict in their favor.

With these observations, I leave the case to your patient and attentive consideration.

The jury then retired. After being in consultation for twenty-four hours, they came again into court, and, upon stating their inability to agree upon a verdict, were discharged.